**FILED**

**March 01, 2010**

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002450323

1 PROBER & RAPHAEL, A LAW CORPORATION
DEAN R. PROBER, ESQUIRE, #106207
2 LEE S. RAPHAEL, ESQUIRE #180030
CASSANDRA J. RICHEY, ESQUIRE #155721
3 DAVID F. MAKKABI, ESQUIRE # 249825
20750 Ventura Boulevard, Suite 100
4 P. O. Box 4365
Woodland Hills, California 91365-4365
5 (818) 227-0100
C.094-3878A
6 Attorneys for Secured Creditor.

7

8 UNITED STATES BANKRUPTCY COURT

9 EASTERN DISTRICT OF CALIFORNIA (SACRAMENTO)

10

11 In re                                    )    Bk. No. 10-21656
                                           )
12 RICKIE WALKER,                          )
                                           )    CHAPTER 11
13          Debtor.                        )
   _____)

14

15      **NOTICE OF SECURITY INTEREST IN RENTS AND PROFITS**

16          TO DEBTOR, DEBTOR' ATTORNEY AND ALL INTERESTED PARTIES:

17          NOTICE IS HEREBY GIVEN pursuant to 11 U.S.C. §§ 552(b) and 546(b) of the

18 Bankruptcy Code that BAC Home Loans Servicing, L.P. its assignees and/or successors in

19 interest, has a security interest in the rents and profits in that certain real property commonly

20 known as **1518 Michael Drive, Tracy, California**.

21          Said security interest arises from a Promissory Note and Deed of Trust dated May

22 4, 2006 in the original amount of $ 73,500.00.  A copy of the Note and Deed of Trust is attached

23 hereto as **Exhibit "A"** and is incorporated herein by this reference.

24          NOTICE IS HEREBY GIVEN that pursuant to Bankruptcy Code § 546(b), BAC

25 Home Loans Servicing, L.P., its assignees and/or successors in interest, hereby claims a

26 perfected security interest in rents, issues and profits of the afore-described subject property.

27          NOTICE IS ALSO GIVEN that as a result of this Notice of Perfection under

28

§546(b) concerning the rents, issues and profits from the subject Property, that all rents, issues and profits generated hereafter from the afore-described real property are deemed cash collateral as defined under 11 U.S.C. § 363(a) and are subject to the perfected security interest held by BAC Home Loans Servicing, L.P., its assignees and/or successors in interest.

NOTICE IS HEREBY GIVEN that said cash collateral must be segregated and separately accounted for pursuant to Bankruptcy Code § 363(c)(4).

NOTICE IS FURTHER GIVEN that BAC Home Loans Servicing, L.P., its assignees and/or successors in interest, does not consent to the use of their cash collateral and hereby demands that such funds generated from the subject real property be segregated and separately accounted for as required by law and turned over to BAC Home Loans Servicing, L.P., its assignees and/or successors in interest.

Dated: 02/17/2010                                    Prober & Raphael, A Law Corporation


                                                     /s/ Dean R. Prober, Esq.
                                                     DEAN R. PROBER, ESQUIRE, #106207

1

<u>PROOF OF SERVICE</u>

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

3

I, Barbara Scott, certify that I am a resident of the County aforesaid; I am over the

4

age of 18 years and not a party to the within action; my business address is 20750 Ventura

5

Boulevard, Suite 100, Woodland Hills, California 91364.

6

On March 1, 2010, I served the within NOTICE OF SECURITY INTEREST IN RENTS

7

AND PROFITS on all interested parties in this proceeding by placing true and correct copy

8

thereof enclosed in a sealed envelope with postage prepaid in the United States Mail at

9

Woodland Hills, California, addressed as follows:

10

Rickie Walker
3830 Whitney Oaks Dr.

11

Rocklin, CA  95765

12

Debtor

13

Mitchell L. Abdallah, Esquire
980 9th Street, 16th Fl

14

Sacramento, CA 95814
Attorney for Debtor

15

16

Office of the U.S. Trustee
Robert T. Matsui U.S. Courthouse

17

501 I Street, Room 7-500
Sacramento, CA  95814

18

19

I declare that I am employed in the office of a member of the Bar at whose

20

direction this service was made.

21

I certify under penalty of perjury that the foregoing is true and correct.

22

Executed on March 1, 2010 at Woodland Hills, California.

23

<u>/s/ Barbara Scott</u>

24

25

26

27

28



We hereby certify this is a true and correct copy of the original document.
FIDELITY NATIONAL TITLE
By

MIN: 1000970-9060426000-3
DATE: MAY 4, 2006
BORROWER: RICKIE WALKER

LOAN #: _____
PROPERTY ADDRESS: 1518 MICHAEL DRIVE, TRACY, CALIFORNIA 95377

## HOME EQUITY CREDIT LINE AGREEMENT AND DISCLOSURE STATEMENT

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you, PMAC LENDING SERVICES, INC., A CALIFORNIA CORPORATION

The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to PMAC LENDING SERVICES, INC., A CALIFORNIA CORPORATION        .

**1. LOANS; DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 5 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 12.B, 12.D, 13.B or 17.A below.) You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent that the proceeds of this loan are for the purchase of the Property.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 13.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

**2. MAKING LOANS.** You will make loans under this Agreement (up to my Available Credit Limit) by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) if you issue an access card ("Card"); by honoring advances I request by using the Card at any Merchant or servicer provider ("Merchant") or any participating automated teller machine ("ATM") networks; (iii) paying closing costs and finance charges in accordance with paragraph 8.C below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Deed of Trust; or (vi) any other method or procedure you establish.

**3. SPECIAL CARD TERMS AND CONDITIONS.** I understand that you, in your sole discretion and at your sole option, may cause to be issued a Card, as an access device and an additional means by which I may obtain advances under the Account. By applying for the Account, I have requested that you issue the Card to me if my application is approved and if you, at your option and in your sole discretion, provide access to my/our Account by the Card after the Account is opened. If one or more Cards are issued to me as a means of obtaining loan advances on my Account, I agree that my use of the Card and any related loan advances will be governed by the following terms and conditions unless I cancel any card within [30] days of receiving the Card and have not authorized the use of the Card or Card account number. I also agree to comply with any agreement between me and the Card Issuer:

A. Account Access. In addition to any means by which I may access my Account as described in the Agreement, I may be permitted to obtain (up to my Available Credit Limit) loan advances by using any Card you provide, at any merchant or service provider ("Merchant") that allows me to use the Card to pay for goods or services. If you provide me with a Personal Identification Number ("PIN"), I may also obtain loan advances by using the Card at participating automated teller machine ("ATM") networks. I agree not to write my PIN on my Card(s) or disclose it to others. If I use my Card at an ATM, I understand that the owner of the ATM may charge me a fee for the transaction. I understand that in order to use my Card at an ATM, I must call the 800 assistance number which appears on the reverse side of my Card to request a PIN. I also understand that Card loan advances (whether at a Merchant or ATM) may be subject to transactional limits that could restrict the full use of my Available Credit Limit. There are no minimum draw requirements that apply when I use the Card, except for any limits that may be imposed separately by a Merchant or ATM owner. I agree that if you decide in your sole discretion to approve any transactions above my Available Credit Limit, I will be responsible for the full amount of any such advances. I understand that if I make reservations or purchases of any kind using my Card, my Account may be immediately charged for the full amount of the reservation or purchase, regardless of whether I have received the goods or services requested at the time my Account is charged.

B. Liability. I agree that all borrowers who have executed the Agreement are jointly and severally liable under the terms of the Agreement for any Card transactions that are posted to the Account, whether or not a Card has been issued to all borrowers.

HELOC - CA Agreement & Disclosure
FE-313D(CA) (0601)                    Page 1 of 10                    Initials: _____

CA.rw

 

C. Authorizations. All Card transactions are processed through the applicable bankcard networks that are branded on the Card ("Bankcard Networks") according to the requirements and procedures of the Bankcard Networks. Some Card transactions may require prior authorization by you or pursuant to the requirements and procedures of the Bankcard Networks before they are approved for processing. The Bankcard Networks may refuse to process any Card transaction if it appears to be illegal or fraudulent, or if the Merchant or the transaction does not otherwise meet the requirements of the Bankcard Networks. In addition, you or the Card Issuer may deny authorization for any Card transaction if my Account has been suspended or terminated. I also agree that if you or the Card Issuer detects any suspicious or unusual use, you or the Card Issuer may suspend use of any Card.

D. Lawful Transactions. I agree to use my Card only for valid and lawful purposes. If I use my Card for any other purpose or transaction (herein called a ("Prohibited Activity"), including, without limitation, gambling activities, I agree to promptly reimburse you, the Card Issuer (if other than you) and the Bankcard Networks for all amounts or expenses paid by any such party as a result of such use. You reserve the right to block any Prohibited Activity and/or to not approve any authorization request for a Prohibited Activity. Card transactions for any Prohibited Activity made by me or for my benefit shall be considered authorized by me. You will not be liable if I engage in any Prohibited Activity using the Card, and I will be responsible for the full amount of any loan advances made in connection with such Prohibited Activity. Display by an online merchant of the service mark of any Bankcard Network branded on the Card does not mean that a Card transaction over the Internet is legal where I reside.

E. Transactions With Merchants. I understand and agree that: (1) If a Merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", "all sales final", or similar language, I will be bound by that policy when I use my Card to pay for goods or services from that Merchant; (2) When using my Card to make travel or lodging reservations, I must obtain the Merchant's cancellation policy and follow it if I cancel the reservations. If I cancel, I must obtain the cancellation number that the Merchant is required to give me pursuant to the requirements and procedures of the Bankcard Networks. The Merchant may charge me for a cancelled transaction unless I can provide you with a correct cancellation number. (3) If I authorize a Merchant to charge repeat transactions to my Account without my presenting my Card for each charge, then I must notify the Merchant when I want to discontinue the repeat transactions or if my Account is suspended or closed. Otherwise, I will be responsible to you for the amount of all such repeat transactions. I understand that if my loan advance privileges or my use of the Card is suspended or cancelled for any reason, it is my responsibility to pay for such repeat transactions directly until loan advance privileges and/or Card use are reinstated. (4) If I disagree with any transaction on my monthly statement or have a dispute with any Merchant as a result of a Card transaction, I agree to comply with the section entitled MY BILLING RIGHTS - I SHOULD KEEP THIS NOTICE FOR FUTURE USE in my Agreement. I will promptly provide you with such information or assistance as you reasonably request.

F. Foreign Transactions. I agree to pay you in U.S. dollars. If I make a Card transaction in a foreign currency, the appropriate Bankcard Network will convert the transaction amount into U.S. dollars at the rates, and in accordance with its operating regulations in effect at the time the transaction is processed. Currently, the regulations of the Bankcard Networks provide that the currency conversion rate to be used is either a wholesale market rate selected by the Bankcard Networks or a government-mandated rate. Each in effect one day prior to the processing date, plus an adjustment factor (currently 1%) established by the Bankcard Networks. The Bankcard Networks may change the currency conversion rate, and the formula used to establish that rate, from time to time. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date. The currency conversion rate used may be the same as, greater than or less than the amount that would be calculated by conversion through a financial institution in the country in which the transaction occurred. I understand that you do not determine the currency conversion rate or the formula to establish the rate that is used by the Bankcard Networks and that you do not receive any portion of the currency conversion rate used by the Bankcard Networks.

G. Limitation of Liability. Your liability to me, if any, for wrongful dishonor of any loan request I make using my Card is limited to my actual damages. I also agree that you are not responsible if any transaction is not approved, whether by you, a Merchant, Bankcard Network, or a third party, even if I have sufficient credit available.

H. Termination/Suspension of Account. Upon any termination or cancellation of my Account by you or by me, or any suspension of my loan advance privileges under the Agreement, I agree that all Cards will be destroyed by me upon your instruction, or may be retrieved by you or your agent.

I. Cancellation/Expiration of Cards. I may be permitted to use the Card to access my account only so long as the access card program remains active and you permit me to participate in the program. If more than one person has executed the Agreement, any one of us may request that our Cards be cancelled. The request, at your option, may be made verbally or in writing. You may also cancel any Card at your sole discretion at any time, including if (1) the contracts with current or future providers of services used to operate the Card program expire or are terminated; or (2) I have not used my Card to obtain a loan advance on my Account at least once during any 12 month period; (3) my card is lost, stolen, or otherwise subject to unauthorized use; or (4) any part of the Program, including use of the Card, is prohibited by applicable law. I understand and agree that the terms governing my ability to obtain loan advances during the Initial Draw Period and any renewed Draw Period are set forth in the Agreement and that those terms supersede any inconsistent expiration date(s) printed on any Cards that are issued to me to the extent that such expiration date(s) is (are) later than the expiration date of any Draw period defined in the Agreement.

J. Lost or Stolen Cards. I agree to promptly notify you at 1-800-556-5678 if any Card is lost or stolen, or if I suspect unauthorized use. You reserve the right not to honor any loan advance request made using a Card if any of my Cards has been cancelled or reported lost or stolen.

La Case 10-21656    Filed 03/01/10    Doc 32

 

K. Unauthorized Transactions. I will not be liable for the unauthorized use of my Card. I agree to assist you in your investigation of any claims of unauthorized Card transactions and understand that I may be required to provide you with a written statement and/or an Affidavit of Forgery. I agree that if I permit a person to use the Card or Card account number, or if I benefit from another person's use of the Card or Card account number, such use is not unauthorized use of the Card, even if I did not intend to be responsible for such use.

L. Special Rule for Card Purchases. The following is in addition to the notice at the end of the Agreement entitled MY BILLING RIGHTS - I SHOULD KEEP THIS NOTICE FOR FUTURE USE:

Special Rule for Card Purchases.

If I have a problem with the quality of property or services that I purchased with my Card, and I have tried in good faith to correct the problem with the merchant, I may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) I must have made the purchase in my home state or, if not within my home state, within 100 miles of my current mailing address; and

(b) The purchase price must have been more than $50. These limitations do not apply if you or the Card Issuer own or operate the merchant, or if you or the Card Issuer mailed me the advertisement for the property or services.

## 4. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement monthly, except that my first periodic statement may be generated and mailed to me between thirty and sixty days after I open my Account. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance", my Annual Percentage Rate, the amount of my "Minimum Payment Due", my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or any part of my "New Balance" at any time, subject to an Account Termination Fee described in paragraph 8.D below. As periodic finance charges will accrue on my Account balance until it is fully repaid, any periodic finance charges incurred for the billing cycle in which full payment of the New Balance shown on the previous periodic statement is received by you will be reflected on my next periodic statement. If I want to include those finance charges with the payment of the New Balance shown on my previous periodic statement, I will contact     PMAC LENDING SERVICES, INC. ("US") FAIRFIELD RANCH ROAD SUITE 200, CHINO HILLS, CALIFORNIA 91709

for details concerning the amount I must include.

D. I may pay all or any part of my "New Balance" using an Equity Credit Line Check ("Check"). If I use a check to pay all or any part of my New Balance, I understand that:

(1) The amount of the Check will be treated as any other advance is treated under the terms and conditions of my Account. My Check will not be honored if I do not have sufficient availability on my Account.

(2) If I make a payment using a Check, my principal balance will not decrease. The principal balance will increase by the amount of the Check.

(3) Interest will accrue on the total increased principal balance when I use a Check to make a payment on my Account.

(4) I may not use a Check to make a payment once the Draw Period ends. That is, a Check may not be used to make a payment during the Repayment Period.

E. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 13.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

F. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my account.

G. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

5. CREDIT LIMIT. My Credit Limit under this Agreement is $ 73,500.00     . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other non-cash method, you reserve the right to make

 

loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit.

**6. ANNUAL PERCENTAGE RATE.**
*One box must be checked by Lender.*

☐ A. The initial Daily Periodic Rate is                                    %. The initial ANNUAL PERCENTAGE RATE
is                           %. These rates are "discounted" rates. This means that these rates are lower than the rates that
would be in effect if the formula set forth in paragraph 6.C below had been used, in which event the initial Daily Periodic Rate
would be                           % and the initial ANNUAL PERCENTAGE RATE would be                           %.
These discounted rates will be in effect from the date of this Agreement until                           . Thereafter, the
Daily Periodic Rate and Annual Percentage Rate will be determined using the formula set forth in paragraph 6.C below.

☒ B. The initial Daily Periodic Rate is                    0.02568   % and the initial ANNUAL PERCENTAGE RATE is
          9.375 %.   These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (beginning with the first day of the first billing cycle after my "discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 6.D below. Each billing cycle will end on the last day of the calendar month. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the ANNUAL PERCENTAGE RATE divided by 365.

D. The "Margin" to be used under paragraph 6.C above to determine my ANNUAL PERCENTAGE RATE
is             1.625 %.

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and not other costs. The ANNUAL PERCENTAGE RATE will never increase above                           18.000%.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay additional periodic finance charges and as a result, I will have to pay larger "Minimum Payments."

**7. FINANCE CHARGE.**   I agree to pay a finance charge on my Account as explained below.

A. Periodic **FINANCE CHARGE.**

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. Any loan advance represented by a Card transaction will be posted to my Account as of the date that you receive the transaction for processing. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. There is no grace period during which I can repay loan advances without incurring a periodic finance charge.

(2) You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.

(3) To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

B. Other **FINANCE CHARGES.**

(1) Points **FINANCE CHARGE.**

I agree to pay a Points FINANCE CHARGE of $                    at the time I sign this Agreement.
SEE "ADDENDUM TO AGREEMENT AND DISCLOSURE STATEMENT" ATTACHED HERETO AND MADE A PART HEREOF

| | |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

CERTIFIED TO BE A TRUE
AND CORRECT DOCUMENT
THE ORIGINAL

initials:

 

(2) Broker Fee FINANCE CHARGES. SEE "ADDENDUM TO AGREEMENT AND DISCLOSURE STATEMENT" ATTACHED HERETO AND MADE A PART HEREOF

I agree to pay Broker Fee FINANCE CHARGES of $          at the time I sign this Agreement.

| | $ |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |

(3) Settlement Agent FINANCE CHARGES. SEE "ADDENDUM TO AGREEMENT AND DISCLOSURE STATEMENT" ATTACHED HERETO AND MADE A PART HEREOF

I agree to pay the following Settlement Agent FINANCE CHARGES at the time I sign this Agreement:

Sub Escrow/Full Escrow

| | $ |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |

(4) Miscellaneous FINANCE CHARGES. SEE "ADDENDUM TO AGREEMENT AND DISCLOSURE STATEMENT" ATTACHED HERETO AND MADE A PART HEREOF

I agree to pay the following Miscellaneous FINANCE CHARGES at the time I sign this Agreement:

| | $ |
|---|---|
| | $ |
| | $ |
| | $ |

(5) Annual Maintenance Fee FINANCE CHARGES.

[X] I agree that an annual maintenance fee FINANCE CHARGE of $75 which you will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions: (a) I maintain an average outstanding daily balance which does not fall below $20,000 from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment. You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

[ ] I will not be charged an annual maintenance fee FINANCE CHARGE on this loan.

**8. OTHER CHARGES.**

A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this Agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

(1) If I fail to make my "Minimum Payment Due" within 15 days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment or $5.00, whichever is greater.

(2) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:
SEE "ADDENDUM TO AGREEMENT AND DISCLOSURE STATEMENT" ATTACHED HERETO AND MADE A PART HEREOF

| | |
|---|---|
| Survey | $ |
| Appraisal | $ |
| Document Preparation Fee | $ |
| Credit Report | $ |
| Stamp Tax | $ |
| Recording Fee | $ |
| Title Search | $ |
| Title Insurance | $ |
| Title Guaranty | $ |
| | $ |
| | $ |
| | $ |
| | $ |

LESS Amounts Paid by Lender       $
SEE "ADDENDUM TO AGREEMENT AND DISCLOSURE STATEMENT" ATTACHED HERETO AND MADE A PART HEREOF
Total Paid by Borrower       $

C. I may elect to pay the closing costs described in paragraph 8.B above and the finance charges described in paragraph 7.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

D. I agree to pay an Account Termination Fee (considered a prepayment penalty under federal law) of $350 to cover your costs of processing and administering my Account, if I pay in full and terminate my Account with you and ask you to satisfy my mortgage lien on or before the fifth (5th) anniversary of this Agreement.

E. I agree to pay a Demand Statement Fee of $30 for furnishing a statement of the amount necessary to pay in full the debt evidenced by this Agreement. I agree to pay this fee upon payment in full of the Account.

F. I agree to pay a Reconveyance Preparation Fee of $45 for delivering a full reconveyance of the deed of trust securing the debt evidenced by this Agreement.

9. **PROPERTY SECURITY.** To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Deed of Trust (the "Deed of Trust") covering my dwelling located at 1518 MICHAEL DRIVE, TRACY, CALIFORNIA 95377
(the "Property"). The Deed of Trust is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Property is damaged or destroyed and whether or not any insurance proceeds are available.

## 10. SECTION INTENTIONALLY OMITTED.

11. **PROPERTY INSURANCE.** I agree to obtain and maintain property insurance against loss or damage to the Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Deed of Trust or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

## 12. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.

A. You may take the actions listed in paragraph 12.B below during the period that any of the following events or conditions occur:

    (1)    the value of the Property declines significantly below its appraised value for the purposes of my Account;




    (2)    you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

    (3)    I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 15 below;

    (4)    government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

    (5)    government action (such as imposition of a tax lien) impairs the priority of the lien of the Deed of Trust such that the value of the lien of the Deed of Trust is less than 120% of my Credit Limit;

    (6)    the maximum Annual Percentage Rate set forth in paragraph 6.E above is reached;

    (7)    the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

B. During the period in which a condition described in paragraph 12.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 12.A above or 13.A below have occurred.

C. Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Deed of Trust is not impaired.

D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 12.A above or 13.A below has occurred.

CERTIFIED TO BE A TRUE COPY OF THE ORIGINAL DOCUMENT

 

E. If an event or condition described in paragraph 12.A above occurs which is also an event or condition described in paragraph 13.A below, your rights and remedies described under paragraph 13.B below apply and supersede your rights described in this paragraph 12.

## 13. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. You may take the actions listed in paragraph 13.B below if any of the following events or conditions occur:

    (1)    I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

    (2)    I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Deed of Trust;

    (3)    I sell or transfer title to the Property without first obtaining your written permission (also, see paragraph 19.N below);

    (4)    I fail to maintain insurance on the Property as required under this Agreement or the Deed of Trust;

    (5)    I act or fail to act and as a result a lien senior to the lien of the Deed of Trust is filed against the Property;

    (6)    I die and I am not survived by another person obligated as a Borrower under this Agreement;

    (7)    All or part of the Property is taken through eminent domain, condemnation or similar government taking;

    (8)    A prior lienholder on the Property begins foreclosure under its security document;

    (9)    The Property is used for an illegal purpose which could subject the Property to seizure;

    (10)    I fail to pay taxes on the Property; or

    (11)    My action or inaction adversely affects the Real Property or your rights in the Property. Such action or inaction could include, for example, the following:

        (a)    A judgment is filed against me;

        (b)    I commit waste or otherwise destructively use or fail to maintain the Property;

        (c)    I die and I am survived by another person obligated as a Borrower under this Agreement; or

        (d)    I move out of the Property.

*[stamp overlay: CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT]*

B. If an event described in paragraph 13.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

    (1)    you may terminate any of my rights under my Account;

    (2)    you may temporarily or permanently refuse to make any additional loans;

    (3)    you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

    (4)    you may foreclose the Deed of Trust;

    (5)    you may reduce my Credit Limit; and

    (6)    you may take any other action permitted by this Agreement, by law or in equity.

14. SALE OF PREMISES. I will not sell, transfer ownership of, mortgage, or otherwise dispose of my interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises, or transfer possession, whether by lease, rental, or otherwise, or discontinue to use the Premises as my primary and/or personal residence without your prior written consent.

## 15. MY IMPORTANT OBLIGATIONS. I agree that:

A. I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

B. I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C. From time to time, if requested, I will supply you with current financial information about me.

D. I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Deed of Trust.

E. I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Property.

F. I will not use or allow use of the Property for any illegal purpose.

 

G. I will not move out of the Property.

H. I will not permit a lien to be filed which takes priority over the Deed of Trust for future advances made under this Agreement.

I. I will not break any promise made in this Agreement or in the Deed of Trust such as:

    (1)   my promise not to exceed my Credit Limit; and

    (2)   my "Important Obligations" listed in the Deed of Trust.

16. COSTS OF COLLECTION. Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

17. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.

A. Termination by Me. I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 17.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 12.D above.

B. Termination by You. My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 12.B or 13.B above or my exercise of my suspension or termination rights under paragraphs 12.D or 17.A above.

C. Effect of Termination. Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 13.B above. I must return unused Equity Credit Line Checks to you upon termination. I may be required to pay an Account Termination Fee pursuant to paragraph 8:D above.

18. CHANGES TO AGREEMENT.

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT

A. You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

    (1)   if the original Index is no longer available, you may change the Index and Margin;

    (2)   you may make any change I agree to in writing;

    (3)   you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

    (4)   you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

B. If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

19. OTHER PROVISIONS.

A. Third Parties. This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me, I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Deed of Trust at any time without my consent.

B. Additional Credit Reports and Appraisals. I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Property and the Deed of Trust as you may deem necessary from time to time. I will cooperate in having the Property reappraised.

C. Tax Deductibility. I know that I should consult a tax adviser regarding the deductibility of interest and charges.

D. Applicable Law. I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Property is located.

E. Application of Payments. You may apply payments and proceeds of the Property in such order as you shall deem advisable or as otherwise required by applicable law.

Cozw

        

F. Failure to Perform. If I violate or fail to perform any term or condition of this Agreement (or the Deed of Trust), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

G. Waiver of Jury Trial. I waive my right to a jury trial.

H. Complete Understanding of the Parties. There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

I. Waiver of Notice. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z.

J. Meaning of Words. All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

K. Payment Marked "Payment In Full". I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to    PMAC LENDING SERVICES, INC.
15325 FAIRFIELD RANCH ROAD SUITE 200, CHINO HILLS, CALIFORNIA 91709

L. Enforcement. You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

M. Notices. Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 18.M and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at    PMAC LENDING SERVICES, INC.
15325 FAIRFIELD RANCH ROAD SUITE 200, CHINO HILLS, CALIFORNIA 91709

or to such other address as you may designate by written notice to me as provided in this paragraph 18.M.

N. Sale or Transfer of Property. I understand that one of the provisions of the Deed of Trust states: "Upon default by Trustor [the owner(s) of the Property] in the performance of any payment or other obligation secured hereby or in the performance of any agreement hereunder, or if, whether voluntarily or involuntarily, there is a sale or transfer of all or any part of the Property or any interest therein, or (ii) a beneficial interest in Trustor and Trustor is not a natural person, or if Trustor ceases to use the Property as Trustor's primary residence, Beneficiary [you] may declare all sums secured hereby immediately due and but no notice or demand and no waiver of this right shall be effective unless in writing and signed by Beneficiary."

O. Riders/Addenda. The covenants and agreements of the rider/addendum checked below are incorporated into and supplement and amend the terms of this Agreement.

[X] Billing Rights Notice

Initials



BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: RICKIE WALKER                                    5-5-06
                                                            Date

Borrower:                                                  Date

Borrower:                                                  Date

Borrower:                                                  Date

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF
THE ORIGINAL DOCUMENT

Ca c#

## ADDENDUM TO HOME EQUITY CREDIT LINE
## AGREEMENT AND DISCLOSURE STATEMENT

Date:MAY 4, 2006
Borrower:RICKIE WALKER

Property Address:1518 MICHAEL DRIVE, TRACY, CALIFORNIA 95377

**7B. OTHER FINANCE CHARGES.**
(1) Points FINANCE CHARGE.
Origination Fee                                                                              0.00

Broker Fee FINANCE CHARGE.                                                    0.00

Settlement Agent FINANCE CHARGE.                                          0.00

Miscellaneous FINANCE CHARGE.
PROCESSING FEE                                                                         345.00

**8.    OTHER CHARGES**
B:
REC/FILING FEE                                                                             60.00
TITLE FEE                                                                                      450.00

Total                                              $                                         510.00

By signing below, I hereby acknowledge receipt of this Addendum to the Home Equity Line Agreement and Disclosure Statement.

_Richie Walker_                    5-5-06
Borrower RICKIE WALKER              Date           Borrower                                    Date

Borrower                                        Date           Borrower                                    Date

Borrower                                        Date           Borrower                                    Date



000009701    WAL    R

610    )2  001  002

Recording Requested By:
PMAC LENDING SERVICES, INC.

After Recording Return To:
PMAC LENDING SERVICES, INC.
15325 FAIRFIELD RANCH ROAD
SUITE 200, CHINO HILLS,
CALIFORNIA 91709

**DOC # 2006-103371**
05/12/2006 07:39A Fee:49.00
Page 1 of 12
Recorded in Official Records
County of San Joaquin
GARY W. FREEMAN
Assessor-Recorder-County Clerk
Paid by FIDELITY NATL TITLE INS CO

Prepared By:
PREFERRED MORTGAGE ALLIANCE CORP.
100 NORTH CITRUS STREET, #430
WEST COVINA, CALIFORNIA 91791
———————————— [Space Above This Line For Recording Data] ————————————
5104182-MQ
DOC ID #:

## DEED OF TRUST AND ASSIGNMENT OF RENTS
MIN

This deed of trust secures an obligation which calls for payment of interest at a variable interest rate.
THIS DEED OF TRUST is made this    4th    day of MAY, 2006    , between
RICKIE WALKER, AN UNMARRIED MAN

herein called "Trustor," FIDELITY NATIONAL TITLE, 1801 N. CALIFORNIA
BLVD. #101, WALNUT CREEK, CALIFORNIA 94596    ,

herein called "Trustee," and "Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as
nominee for PMAC LENDING SERVICES, INC., A CALIFORNIA
CORPORATION    ,
(hereinafter "you" or "Lender" and Lender's successors and assigns.) MERS is organized and existing
under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI
48501-2026, tel. (888) 679-MERS, herein called "Beneficiary."

Trustor irrevocably grants, transfers and assigns to Trustee, in trust and with power of sale, all of the real
property in the City or Town of TRACY    , County of
SAN JOAQUIN    , State of California, having the street address of
1518 MICHAEL DRIVE, TRACY, CALIFORNIA 95377
and more specifically described as:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 238 480 29

HELOC - CA Deed of Trust with MERS    Page 1 of 10    Initials: _____
FE-4331(CA) (0204)    FORMSEDGE - (800)635-4111    4/00

Scan
5/11/06

Cs4331.cw

Parcel ID Number: 238 480 29                    together with all improvements
now or hereafter erected on the property, and all easements, rights, appurtenances, rents (subject however
to the rights and authorities given herein to Beneficiary to collect and apply such rents), royalties, mineral,
oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter
attached to the property, all of which, including replacements and additions thereto, shall be deemed to be
and remain a part of the property covered by this deed of trust; and all of the foregoing, together with said
property (or the leasehold estate if this deed of trust is on a leasehold) are herein referred to as the
"Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by
Borrower in this Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for
Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests,
including, but not limited to, the right to foreclose and sell the Property; and to take any action required of
Lender including, but not limited to, releasing or canceling this Deed of Trust.

1.     THIS DEED OF TRUST SECURES:

        a.   All of the obligations of Trustor in favor of Beneficiary or order under the terms of a
revolving credit agreement dated   MAY 4, 2006          , herein called Agreement. The
Agreement provides, among other things, for the payment of all sums advanced by Beneficiary
from time to time pursuant to the Agreement and for the payment of interest. The maximum
principal obligation under the Agreement to be secured by this deed of trust at any one time is
SEVENTY-THREE THOUSAND FIVE HUNDRED AND 00/100
Dollars ($ 73,500.00     ) unless Beneficiary, with Trustor's written consent, hereafter
increases this amount. Advances made by Beneficiary to protect the security of this deed of trust
or to preserve the Property shall not he subject to the limitation of the preceding sentence.

        The security of this deed of trust shall not be affected by the extension, renewal or modification
from time to time of the obligations, instruments or agreements described above.

        b.   Payment of any and all obligations and liabilities, whatsoever, whether primary, secondary,
direct, indirect, fixed or contingent, whether now or hereafter due from Trustor (or any successor
in interest to Trustor) whether created directly or acquired by assignment if the document
evidencing such obligation or liability or any other writing signed by Trustor (or any successor in
interest to Trustor) specifically provides that said obligation or liability is secured by this deed of
trust.

        c.   Performance of each agreement of Trustor herein contained or contained in any other
agreement, instrument or other writing to which Trustor is a party if the same is written in
connection with any of the foregoing.

FE-4331(CA) (0204)                      Page 2 of 10                        Initials: _____

d.   Payment of all sums to be expended by the Beneficiary or Trustee pursuant to the terms hereof.

2.   TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:

a.   To keep the Property in good condition and repair; not to remove or demolish any building or improvement thereon; to complete or cause to be completed any construction of buildings or other improvements thereon which are financed in whole or in part by the indebtedness secured hereby and to restore promptly and in good and workmanlike manner any building or other improvement which may be damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting the Property or requiring any alteration or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, weed, fertilize, fumigate, spray, prune and do all other acts which from the character or use of the Property may be reasonably necessary, the specific enumerations herein not excluding the general.

b.   To provide, maintain and deliver to Beneficiary fire and other insurance on the Property satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary, the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default hereunder or invalidate any act done pursuant to such notice.

c.   To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this deed of trust.

d.   To pay at least ten days before delinquency all taxes and assessments affecting the Property, including, without limitation, assessment on appurtenant water stock, all encumbrances, charges and liens on the Property or any part thereof, and all costs, fees and expenses of this Trust.

e.   That should Trustor fail to make any payment or do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may:

(1)   Make or do the same in such manner and to such extent as either may deem necessary or appropriate to protect the security hereof, Beneficiary or Trustee being authorized to enter upon the Property for such purposes.

(2)   Appear in and defend any action or proceeding purporting to affect the security hereof or the rights or power of Beneficiary or Trustee.

(3)   Pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior and superior hereto.

(4)   In exercising any such powers, pay necessary expenses, employ counsel and pay his or her reasonable fees.

f.   To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the maximum rate allowed by law in effect at the date hereof or at the option of Beneficiary, such sums may be added to the principal balance of any indebtedness secured hereby and shall bear the highest rate of interest as any such indebtedness.

g.   To pay for any statement provided for by the law in effect on the date hereof regarding the obligation secured hereby in the amount demanded by the Beneficiary but not to exceed the maximum allowed by law at the time the statement is demanded.

3.   IT IS FURTHER AGREED THAT:

a.   Any award of damages in connection with any condemnation for public use of or injury to the Property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such monies received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

b.   By accepting payment of any sum secured hereby after its due date, or after the filing of notice of default and of election to sell, Beneficiary shall not waive its right to require prompt payment when due of all other sums so secured, or to declare default for failure so to pay, or to proceed with the sale under any such notice of default and of election to sell, for any unpaid balance of said indebtedness. If Beneficiary holds any additional security for any obligation secured hereby, it may enforce the sale thereof at its option, either before, contemporaneously with, or after the sale is made hereunder, and on any default of Trustor, Beneficiary may, at its option, offset against any indebtedness owing by it to Trustor, the whole or any part of the indebtedness secured hereby.

c.   Without affecting the liability of any person, including, without limitation, Trustor, for the payment of any indebtedness secured hereby, or the lien of this deed of trust on the remainder of the Property for the full amount of any indebtedness unpaid, Beneficiary and Trustee are respectively empowered as follows:

> (1)  Beneficiary may from time to time and without notice (a) release any person liable for the payment of any of the indebtedness, (b) extend the time or otherwise alter the terms of payment of any of the indebtedness, (c) accept additional security therefor of any kind, including deeds of trust or mortgages, (d) alter, substitute or release any of the Property securing the indebtedness.

> (2)  Trustee may, at any time, and from time to time, upon the written request of Beneficiary (a) consent to the making of any map or plat of the Property, (b) join in granting any easement or creating any restriction thereon, (c) join in any subordination or other agreement affecting this deed of trust or the lien or charge thereof or, (d) reconvey, without any warranty, all or any part of the Property.

d.   Upon (a) written request of Beneficiary or (b) performance of all obligations of the Trustor hereunder and under each and every note, guarantee, Agreement or other writing evidencing the indebtedness secured hereby, and upon surrender of this deed of trust to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held hereunder. The recital in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described

FE-4331(CA) (0204)                    Page 4 of 10                    Initials: _____

Ca4331.cw

as "the person or persons legally entitled thereto." Five years after issuance of such reconveyance, Trustee may destroy said note, guarantee, Agreement or other evidence of indebtedness and this deed of trust (unless directed in such request to retain them).

e. Trustor hereby gives to and confers upon Beneficiary the right, power and authority during the continuance of these trusts to collect the rents, issues and profits of the Property and of any personal property located thereon, and hereby absolutely and unconditionally assigns all such rents, issues and profits to Beneficiary; provided, however, that Beneficiary hereby consents to the collection and retention of such rents, issues and profits as they accrue and become payable only if Trustor is not, at such time, in default with respect to payment of any indebtedness secured hereby or in the performance of any agreement hereunder. Upon any such default, Beneficiary may at any time, without notice, either in person, by agent, or by a receiver to be appointed by a court, without regard to the adequacy of any security for the indebtedness hereby secured and without limiting the generality of Section 2.e.(1), above, enter upon and take possession of the Property or any part thereof, and in its own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine; also perform such acts of repair, nurturing, cultivation, irrigation, weeding, fertilizing, fumigation, spraying, pruning or protection, as may be necessary or proper to conserve the value of the Property or any trees, planting or crops growing thereon; also lease the same or any part thereof for such rental, term, and upon such conditions as its judgment may dictate; also prepare for harvest, sever, remove, and sell any crops that may be growing upon the premises, and apply the net proceeds thereof to the indebtedness secured hereby. The entering upon and taking possession of the Property and performance or failure to perform any of the acts described in the preceding sentence, the collection of or failure to collect such rents, issues and profits, and the application thereof as aforesaid, shall not waive or cure any default or notice of default hereunder, or invalidate any act done pursuant to such notice and shall not constitute or otherwise result in any assumption by or liability of Beneficiary for maintenance, depreciation, misuse or risk of loss other than for damage or loss to the Property due to Beneficiary's gross negligence or intentional torts. Trustor also assigns to Trustee, as further security for the performance of the obligations secured hereby, all prepaid rents and all monies which may have been or may hereafter be deposited with said Trustor by any lessee of the premises herein described, to secure the payment of any rent, and upon default in the performance of any of the provisions hereof, Trustor agrees to deliver such rents and deposits to the Trustee.

f. Upon default by Trustor in the performance of any payment or other obligation secured hereby or in the performance of any agreement hereunder, or if, whether voluntarily or involuntarily, there is a sale or transfer of all or any part of (i) the Property or an interest therein, or (ii) a beneficial interest in Trustor and Trustor is not a natural person, or if Trustor ceases to use the Property as Trustor's primary residence, Beneficiary may declare all sums secured hereby immediately due without notice or demand and no waiver of this right shall be effective unless in writing and signed by Beneficiary.

g. Waiver of a right granted to Beneficiary hereunder as to one transaction or occurrence shall not be deemed to be a waiver of the right as to any subsequent transaction or occurrence. Beneficiary may rescind any notice before Trustee's sale by executing a notice of rescission and recording the same. The recordation of such notice shall constitute also a cancellation of any prior declaration of default and demand for sale, and of any acceleration of maturity of indebtedness

FE-4331(CA) (0204)                                    Page 5 of 10                                    Initials:

affected by any prior declaration or notice of default. The exercise by Beneficiary of the right of rescission shall not constitute a waiver of any default then existing or subsequently occurring, nor impair the right of the Beneficiary to execute other declarations of default and demand for sale, or notices of default and of election to cause the Property to be sold, nor otherwise affect the note or deed of trust, or any of the rights, obligations or remedies of the Beneficiary or Trustee hereunder.

h.   At least three months or any lesser period required by law having elapsed between the recordation of the notice of default and the date of sale, Trustee, having first given notice of sale as then required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as the Trustee may determine, at public auction to the highest bidder for cash, in lawful money of the United State of America, payable at the time of sale except as otherwise permitted by law. Trustee may postpone sale of all or any portion of the Property by public announcement at the time of sale, and from time to time thereafter may postpone the sale by public announcement, all as permitted by law. Trustee shall deliver to the purchaser its deed conveying the Property so sold, but without any covenant or warranty, expressed or implied. The recital in any such deed of any matters or facts, stated either specifically or in general terms, or as conclusions of law or fact, shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary, may purchase at the sale. After deducting all costs, fees and expenses of Trustee and of this trust, including costs of evidence of title in connection with the sale, the Trustee shall apply the proceeds of this sale to the payment of all sums then secured hereby, in such order and manner as may be required by the Beneficiary; the remainder, if any, to be paid to the person or persons legally entitled thereto. If Beneficiary shall elect to bring suit to foreclose this deed of trust in the manner and subject to the provisions, rights and remedies relating to the foreclosure of a mortgage, Beneficiary shall be entitled to reasonable attorney's fees and litigation costs.

i.   Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this deed of trust is recorded and the name and address of the new Trustee.

j.   This deed of trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including, without limitation, pledgees, of the note, guarantee, Agreement, or other evidence of indebtedness secured hereby, whether or not named as Beneficiary herein. In this deed of trust, whenever the context so requires, the singular number includes the plural.

k.   Trustee accepts this Trust when this deed of trust, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

Ce4331.cw

l. If Trustor or any successor in interest to Trustor sells, transfers or encumbers any interest in the Property, whether voluntarily or involuntarily, or if a beneficial interest in Trustor is sold or transferred, voluntarily or involuntarily, and Trustor is not a natural person: (a) the transferor and the transferee shall each immediately give written notice of said transfer to the Beneficiary, at its address designated on the first page of this deed of trust; (b) if the deed of trust secures Trustor's obligation under an Agreement as defined herein, all credit extended by Beneficiary under the Agreement, whether before or after the property is transferred, shall be secured under this deed of trust as if no transfer had occurred except for credit extended by Beneficiary more than five days after it has received the written notices required by this paragraph.

m. The pleading of any statute of limitations as a defense to any and all obligations secured by this deed of trust is hereby waived to the full extent permitted by law.

4. WITH REGARD TO ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES, TRUSTOR AGREES:

a. As used in this Paragraph 4:

(1) "Environmental Law" means all federal, state and local law concerning the public health, safety or welfare, environment or a Hazardous Substance, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sec. 9601 et seq., Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq., Toxic Substances Control Act, 15 U.S.C. Sec. 2601 et seq., Hazardous Materials Transportation Act, 49 U.S.C. Sec. 1801 et seq., Clean Water Act and Water Quality Act of 1987, 33 U.S.C. Sec. 1251 et seq., Safe Drinking Water Act, 41 U.S.C. Sec. 300f et seq., Clean Air Act, 42 U.S.C. Sec. 7901 et seq., Carpenter-Presley-Tanner Hazardous Account Act, Cal.Health & Safety Code Sec. 25300 et seq., Hazardous Waste Control Law, Cal.Health & Safety Code Sec. 25100 et seq., Porter-Cologne Water Quality Control Act, Cal.Water Code Sec. 1300 et seq., Hazardous Waste Disposal Land Use Law, Cal.Health & Safety Code Sec. 25220 et seq., Safe Drinking Water and Toxic Enforcement Act of 1986, Cal.Health & Safety Code Sec. 25249.5 et seq., Hazardous Substances Underground Storage Tank Law, Cal.Health & Safety Code Sec. 25280 et seq., Air Resources Law, Cal.Health & Safety Code Sec. 3900 et seq., Hazardous Materials Release Response Plans and Inventory, Cal.Health & Safety Code Sec. 25500 et seq., and Toxic Pits Cleanup Act of 1984, Cal.Health & Safety Code Sec. 25208 et seq.

(2) "Hazardous Substance" means any substance which has characteristics of ignitability, corrosivity, toxicity, reactivity or radioactivity or other characteristics which render it dangerous or potentially dangerous to public health, safety or welfare or the environment, including without limitation, (i) petroleum or any fraction or other byproduct thereof, (ii) asbestos, (iii) lead, (iv) cyanide, (v) polychlorinated biphenyls, (vi) urea formaldehyde and (vii) anything defined as a "hazardous material," "toxic substance," "hazardous substance," "hazardous waste" or "waste" under any Environmental Law, including without limitation, "hazardous substance" as defined in Cal.Health & Safety Code Sec. 25316 and "waste" and "hazardous substance" as defined in Cal.Water Code Sec. 13050(d) and Sec. 13050(p)(l), respectively. The term is intended by Trustor and Beneficiary to be interpreted in its most comprehensive and cumulative sense.

b. Trustor represents and warrants that except as disclosed to and acknowledged in writing by Beneficiary before the date of this deed of trust:

Cal331.cw

(1)  No Hazardous Substance has been located, used, manufactured, generated, treated, handled, stored, spilled, disposed of, discharged or released by any person on, under or about the Property.

(2)  Trustor has no knowledge of or reason to believe that there is any pending or threatened investigation, assessment, claim, demand, action or proceeding of any kind relating to (i) any alleged or actual Hazardous Substance located under or about the Property or (ii) alleged or actual violation or noncompliance by Trustor or any tenant of Trustor with regard to any Environmental Law involving the Property.

(3)  Neither Trustor nor any tenant of Trustor is required by any Environmental Law to obtain or maintain any permit, license, financial responsibility certificate or other approval as a condition to its business operations or in connection with its use, development or maintenance of the Property.

c.  Trustor represents and warrants that Trustor and every tenant of Trustor have been, are and will remain in full compliance with any Environmental Law applicable to its business operations and its use, development or maintenance of the Property.

d.  Trustor agrees to permit, or cause any tenant of Trustor to permit, Beneficiary to enter and inspect the Property at any reasonable time for purposes of determining, as Beneficiary deems necessary or desirable: (i) the existence, location and nature of any Hazardous Substance on, under or about the Property, (ii) the existence, location, nature, magnitude and spread of any Hazardous Substance that has been spilled, disposed of, discharged or released on, under or about the Property or (iii) whether or not Trustor and any tenant of Trustor are in compliance with applicable Environmental Law. If Trustor or its tenant fails to comply fully with the terms hereof, Beneficiary may obtain affirmative injunctive relief therefor.

e.  Trustor agrees to indemnify and hold Beneficiary and its successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including, without limitation, all costs of litigation and attorneys' fees, which Beneficiary and its successors and assigns may directly or indirectly sustain or suffer as a consequence of any inaccuracy or breach of any representation, warranty or promise made in this deed of trust in connection with any Hazardous Substance or Environmental Law. Notwithstanding any of the language in the deed of trust to the contrary, this indemnity covers claims asserted after all the indebtedness secured by this deed of trust has been paid and discharged, whether or not the deed of trust has also been reconveyed to Trustor. The only exclusions hereto may relate to claims arising out of the affirmative acts of Beneficiary or of a third party after Trustor's interest in the Property has terminated.

f.  The provisions of this Paragraph 4 shall not be affected by the acquisition by Beneficiary or its successors or assigns of any ownership or other interest in the Property beyond Beneficiary's security interest in the Property created under this deed of trust, whether or not such acquisition is pursuant to the foreclosure of this deed of trust or a merger of the interest of the Beneficiary or its successors and assigns in the Property.

Initials: _Ku_

Ce4331.cw

5.    ADDITIONAL PROVISIONS:

a.    The execution of this deed of trust by any person who has no present interest in the Property shall not be deemed to indicate that such an interest presently exists. Rather, execution of this deed of trust by such a person shall constitute such person's agreement that if such person hereafter acquires an interest in the Property, such interest shall be subject to Beneficiary's interest hereunder.

b.    The execution of this deed of trust by any person who has a present interest in the Property shall not in itself be deemed to indicate that such person is liable to Beneficiary for any obligation described in Section 1., above. Any personal liability of such person to Beneficiary shall be determined on an independent basis (such as execution of the document or documents evidencing the obligation described in Section 1., above). Execution of this deed of trust by any such person shall nevertheless indicate that such person's interest in the Property shall be subject to Beneficiary's interest hereunder.

The undersigned Trustors request that a copy of any notice of default, and of any notice of sale hereunder, be mailed to their respective addresses set forth opposite each signature.

<u>By signing below, Trustor agrees to all the terms and conditions of this deed of trust.</u>

Mailing Address For Notices

1518 MICHAEL DRIVE,
TRACY, CA 95377

_____
RICKIE WALKER

_____

_____

_____

**FE-4331(CA)** (0204)                    Page 9 of 10

Ca4331.cw

**State of California**
**County of** ~~SAN JOAQUIN~~ Contra Costa
**On** May 5, 2006    , before me  J. Edelman, notary public
RICKIE WALKER                                    , personally appeared

, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

J. EDELMAN
Commission # 1598314
Notary Public - California
Sacramento County
My Comm. Expires Jul 30, 2009

FE-4331(CA) (0204)                    Page 10 of 10

Ca4331.cw

Loan Number:

Date: MAY 4, 2006

Property Address:   1518 MICHAEL DRIVE, TRACY, CALIFORNIA 95377

## EXHIBIT "A"

## LEGAL DESCRIPTION

A.P.N. # : 238 480 29

DocMagic €Forms 800-649-1362
www.docmagic.com

Legal.msc

Escrow No.: 06-564183-MR
Locate No.: CAFNT0939-0907-0004-0000435295
Title No.: 06-435295

# EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF TRACY, COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

Lot 84, of Tract No. 2883, WESTGATE, UNIT NO. 2 , as per Map filed for record on November 1, 2000, in Book 3S, at page 64 of Maps, records of said County; and

Parcel 2:

Easements and rights as set forth in the Sections entitled, "Easements for Owners", "Support, Settlement and Encroachment", "Utilities and Cable Television", and "Enforcement" of the Declaration of Covenants, Conditions and Restrictions recorded on May 17, 1999, as Instrument No. 99064691, of the Official Records of said County, and any amendments thereto (the "Declaration") and the Supplementary Declaration of Covenants, Conditions and Restrictions (Tract No. 2883: 1-118) recorded on January 31, 2001, as Instrument No. 01014289, of the Official Records of said County (the "Supplementary Declaration").

Except therefrom, easements and rights including, without limitation the reservation of oil, gas and mineral rights and easements for the community antenna television system and for construction, display, maintenance, sales and exhibit purposes. As provided in the Declaration, the Reservation for oil, gas and mineral rights shall not reserve any right to enter upon the surface of the property in the exercise of such rights, as reserved by Standard Pacific Corp., a Delaware corporation, in Deed recorded on July 31, 2001 as Instrument No. 01121653, San Joaquin County Records.